AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT

2/7/22

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)    Case No.    3:22-mj-50
415 Bluebell Court, Clayton, Ohio, including any )
outbuildings, garages, or sheds located on its curtilage )
as well as any vehicles located within the curtilage )

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Attachment A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC s. 841(a)(1)/846 | possession with intent to distribute controlled substances/conspiracy |
| 18 USC s. 922(g)(1) | felon in possession of a firearm |
| 18 USC s. 1956&1957 | money laundering |

The application is based on these facts:

See Attached Affidavit of Steven Lucas

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Steven Lucas*
*Applicant's signature*

Steven Lucas, SA of the DEA
*Printed name and title*

Sworn to before me via telephone.

Date:    2/7/22

City and state:   Dayton, Ohio

Peter B. Silvain, Jr.
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Steven Lucas, hereby duly sworn, declare and state:

## I.

## INTRODUCTION

1.   I am a Special Agent ("SA") of the Drug Enforcement Administration ("DEA").   I therefore am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 21 U.S.C. § 878.

2.   I have been a DEA SA since June 2005 and currently am assigned to the Dayton Resident Office.   I serve as the Resident Agent in Charge ("RAC") of the Dayton office.   Prior to becoming a SA, I was a police officer with the Schererville Police Department between 1995 and 2005.   During that time, I was assigned to the DEA HIDTA group in Merrillville, Indiana for approximately 4 years.   I have conducted and participated in complex drug trafficking conspiracy and money laundering investigations which have resulted in arrests; execution of search warrants that resulted in the seizure of narcotics, narcotics proceeds and other evidence of narcotics trafficking activities; and supervised the activities of cooperating sources (CS) that have provided information and assistance resulting in narcotics purchases. Through training and experience, I am

1

familiar with the manner in which persons involved in the illicit distribution of controlled substances often operate. These people usually attempt to conceal their identities, as well as the locations at which they reside, and where they store controlled substances and the illegal proceeds derived therefrom. Through training and experience, I am familiar with the practices of narcotics distributors, whereby they attempt to conceal the true nature, source and location of proceeds of illegal activity, commonly referred to as money laundering. I have participated in several Title-III wiretap investigations and am familiar with how local drug traffickers and high level traffickers conduct transactions.

## II.

### PURPOSE OF AFFIDAVIT

3. I make this affidavit in support of:

a. a criminal complaint and arrest warrant for Adrian Little for violations of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (felon in possession of a firearm); and 18 U.S.C. § 1956(a)(2)(B)(i) (attempted transport of monetary instruments from a place in the United States to a place outside the United States);

b.   a search warrant for 415 Bluebell Court, Clayton, Ohio 45315 (Target Residence).  This property is more fully depicted in Attachment A, which is attached hereto and incorporated herein by reference.

4.   As detailed more fully below, based on the investigation in this case, I assert that there is probable cause to believe that evidence, contraband, and the fruits associated with the following federal felony offenses (collectively, "Target Offenses") is being stored at or can be found in the Target Residence, including surrounding curtilage, outbuilding, or garages associated with those properties:

a.   Possession with intent to distribute a controlled substance and distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1);

b.   Unlawful use of a communications facility, in violation of Title 21, United States Code, Section 843(b);

c.   Conspiracy to commit offenses under Title 21, in violation of Title 21, United States Code, Section 846;

d.   Felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1);

e.   Money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957.

5. Based on my training and experience, as described above, I believe that there is probable cause to believe that the items listed in Attachment B will be found at the premises described above.

## III.

### SOURCES OF INFORMATION

6. I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation, conclusions I have reached based on my training and experience, and upon information I believe to be reliable from the following sources: oral and written reports about this investigation and other investigations that I have received from federal agents as well as state and local law enforcement agencies; physical surveillance conducted by federal and local law enforcement agents, the details of which have been reported to me either directly or indirectly; telephone records, including toll records and subscriber information; information developed from cooperating sources; information developed from the use of pen registers and/or trap and trace; public records; and electronic global position satellite ("GPS") information for various cell phones.

7.    Unless otherwise noted, when I assert that a statement was made, I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report.  The officer providing me with the information may have received the information by way of personal knowledge or from another source.  Except where otherwise noted, the information set forth in this affidavit has been provided directly or indirectly by agents of the DEA or other law enforcement agencies.  Whenever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.  Moreover, the use of quotations to describe conversations herein either identify the actual words of the speaker or the interpretation of those words.

8.    This affidavit does not include every fact known to me through the investigation, but rather those facts required to establish the probable cause for the issuance of a complaint and search warrant requested above.

## IV.

## **PROBABLE CAUSE**

9.  Since early 2020, the DEA Dayton has been investigating several individuals who appear to work together to traffic kilogram quantities of various controlled substances such as fentanyl, heroin, and methamphetamine in the Dayton, Ohio area.  The group includes an individual currently on post-release control to the Ohio Adult Parole Authority ("APA") – namely, Adrian Little.  APA, in fact, has an outstanding arrest warrant for Little for a parole violation.

10.  During 2007-2008, I participated in a drug investigation involving Little in the Dayton, Ohio area.  DEA and the Greene County Drug Task Force arrested Little on drug charges around that time.  In 2008, he was convicted of drug charges in state court and sentenced to over a decade in prison in the Greene County, Ohio, Court of Common Pleas, Case Number 2007CR867.  Given the length of the sentence, Little knows that he has been convicted of crime punishable by a term of imprisonment exceeding one year.  During that investigation, agents learned that Little was being supplied by a large Mexican-based drug trafficking organization with ties to Dayton, Ohio.

6

11. During early 2020, DEA received information that Little recently was released from Ohio state prison and once more was involved with distribution of drugs in Dayton, Ohio. Specifically, based on conversations with a confidential source ("CS") in March 2020, I learned that Little was again trafficking drugs. CS stated that he/she has known Little for several years and was aware that Little had been released from Ohio state prison for drug trafficking. The CS advised that he/she had received information from Little's drug customers who indicated that Little had a Hispanic source of supply for drugs and that Little currently was obtaining kilogram quantities of fentanyl. It should be noted that the CS is considered reliable; the CS has provided information in the past that has led to arrests as well as the seizure of bulk amounts of controlled substances. CS has provided information to DEA for over a year.

12. During June and July 2020, investigators again spoke with the CS. The CS confirmed that Little was still engaged in drug trafficking activity and that Little was working with other subjects including Mac Dorsey and DeAaron Davis. From a review of court records, I know that Dorsey has a lengthy criminal record, including a prior federal drug trafficking conviction in

7

2016.  Dorsey's federal supervised release on that charge terminated in June 2020.

13.  On March 29, 2020, I was contacted by another DEA office which was conducting an investigation into laundering of drug proceeds by drug traffickers based outside of the United States.  Specifically, based on its investigation, the DEA learned that, from outside the United States, this organization orchestrated the pick-up of drug proceeds from drug dealers in the United States for delivery to sources of supply in Mexico; to facilitate this process, the organization offered contracts for individuals in the United States to pick-up the drug proceeds for transfer of these funds to Mexico.  Based on information from the other DEA office, I learned that the organization had placed and secured a contract to pick-up suspected drug proceeds from a drug trafficker in Dayton, Ohio, for transfer of these funds to sources of supply in Mexico. Based on the other investigation, the Dayton RO was able to utilize a DEA SA, acting in an undercover capacity ("UC"), to contact the Dayton based drug trafficker (later identified as being Little) and arrange the pickup of the suspected drug proceeds for purported transfer to Mexico.

14. On March 31, 2020, the UC contacted a cellular telephone determined to be used by Little and arranged to meet with Little. During the recorded conversations between Little and the UC, Little stated that he had money for pick up but that he would not meet anywhere near Greene County. Little further stated that he previously was arrested and had served 12 years in prison on a case out of Greene County. Little's reticence to meet in Greene County strongly indicates that the money that he sought to deliver constituted drug proceeds.

15. On March 31, 2020, the meeting took place between the UC and Little in Huber Heights, Ohio. Little delivered approximately $33,000 in US currency that was rubber banded and placed in a plastic bag. (Based on my training and experience, I know drug traffickers frequently bundle drug proceeds in this manner). Little had multiple recorded conversations using number (308)209-0896 during the pickup operation. Based on my training and experience, and the circumstances described above, I believe that Little was delivering drug proceeds for transport or transfer to Mexico, where his source of supply appeared to be located. Notably, as described below, during September 2020, DEA recovered a cellular telephone from Little. In that phone, DEA discovered text messages between Little and a Mexican-based

phone number.  The text messages contained discussions of "fetty", a common term for fentanyl, as well as pictures of kilograms of controlled substances.  Given the totality of these circumstances, Little was transferring $33,000 of drug proceeds to the purported courier with the intention that it be transferred or transported to Mexico as payment to his source of supply there.

16.  During 2020, sometime after this transaction, I contacted APA concerning Little and confirmed his status on post-release control.  Additionally, I inquired concerning any addresses that Little had disclosed as his residence to his parole officer.  Little had advised APA that he resided at 507 S Euclid Avenue, Dayton, Ohio.  Little never mentioned or disclosed to APA any connection that he had with 236 Southerly Hills Drive, Englewood, Ohio.  Based on my training and experience, I know that individuals who are on parole frequently hide from their supervising officer locations at which they engage in or transact illegal activity.  Because many parolees such as Little are subject to search and seizure conditions, they do not want to advise the APA concerning these locations for fear that these alternate residences will be searched and their illegal activity discovered.

17.     During June 2020, the Dayton Residence Office was contacted by another DEA Office about a money pickup operation in which $150,000 in United States currency was to be laundered through a drug money courier.  Affiant learned that a drug trafficker (FNU LNU) in Dayton, Ohio had secured a contract for the pick-up and delivery of suspected drug proceeds to this drug organization.  Affiant learned that the other investigation had made recorded calls to 937-250-9642 to negotiate the pickup of the currency.  Upon listening to the call, law enforcement confirmed that the voice of the user of 937-250-9642 matched that of Little during the March 2020 money pickup.  Consequently, law enforcement concluded that Little was the individual in Dayton, Ohio planning to transfer the drug proceeds.  To the knowledge of law enforcement, the money pickup did not occur.

18.  I am aware of a cooperating defendant ("CD") who, during June 2020, is pending federal charges and gave statements to federal investigators.  The CD provided information within his/her own personal knowledge, and the CD's statements have been corroborated by the CS.  Later physical surveillance also corroborated CD's statements.  According to CD, CD witnessed Little sell narcotics to an associate of the CD.  CD further

11

stated that Little also sold narcotics with Dorsey. Based on the CD's statements, the timeframe of his knowledge of Little concerned April and May 2020.

19. During summer 2020, physical surveillance and location information from court-authorized warrants placed Little at the Southerly address. For instance, during June 2020, agents observed Little at Southerly. GPS data for Little's phone also placed him in that area. In August 2020, federal agents obtained a tracking warrant for Little's 2014 Jeep. (Prior to obtaining that warrant, agents had observed Little driving that vehicle). During August 2020, Little's vehicle generally ended the day parked at Southerly and did not move again until the morning. While the car was not there every night during that period, it was there over most nights. Those circumstance strongly indicated that Little resided at Southerly even though he never disclosed it to APA.

20. During September 2020, law enforcement obtained federal search warrants for several residences associated with Little, including Southerly and Euclid. On September 17, 2020, federal agents executed those warrants.

    a. At the Southerly residence – the location at which Little confirmed that he lived -- agents recovered

12

multiple firearms, including multiple Glock handguns and a Springfield XP, as well as $49,000 in United States currency. Law enforcement also recovered a cellular telephone that belonged to Little.  Notably, the utilities for the Southerly address where in the name of Michelle Shinn, Little's girlfriend.  During interviews, both Shinn and Little claimed that the firearms belonged to Shinn; however, Little conceded that he knew the guns were in the residence.  Based on my training and experience, I know that, given Little's access to the firearms, he had the ability to assert control over them. Additionally, I know that drug traffickers frequently have third parties, such as girlfriends or family members, falsely claim ownership of firearms in an effort to avoid criminal liability for them.  I also know that Glock firearms are not manufactured in Ohio and thus moved in interstate commerce to reach this state.

      b.   Pursuant to the warrants, agents also searched the residence that Little reported to APA – namely, the Euclid residence.  At this location, law enforcement recovered a small amount of suspected heroin and approximately $199,000 in United States currency.  A woman named Jacalyn Donegan, who purported to be Little's mother, lived at the residence.  Based on my

training and experience, I know that drug traffickers frequently hide the proceeds of their activities with trusted family members in an effort to avoid detection by law enforcement.

c. During 2020, I spoke with APA concerning Little's job status, and it had no information that Little had employment. Coupling this fact with the money drop that occurred in March 2020, I believe that the bulk currency recovered from Southerly and Euclid represented the proceeds of drug trafficking activity that Little intended to transfer as payments to sources of drug supply in Mexico. Evidence recovered from Little's cellular phone corroborated this conclusion. Specifically, a search of that device revealed text messages between Little and a Mexican-based telephone number that included references to "fetty", a common term for fentanyl.

21. Following the search, DEA contacted APA and advised that agency of the discoveries made during the search warrant of Little's residence. APA moved to revoke Little's supervision and issued an arrest warrant for him. Before it could do so, Little absconded and, according to the CS referenced above, Little went into hiding.

22. During June 2021, DEA debriefed an individual identified herein as CD1. CD1 has a criminal history and spoke

with law enforcement in an effort to reduce CD1's sentencing exposure. CD1 has provided information to other law enforcement agencies in the past that has led to the seizure of drugs as well as the successful prosecution of other individuals. CD1 advised that, during 2020, CD1 received bulk amounts of controlled substances from Little for resale. CD1 advised that Little recently had returned to the Dayton, Ohio area and was selling fentanyl and methamphetamine that Little obtained from a Hispanic source of supply.

23. During June 2021, the CS previously referenced above advised law enforcement that CS had observed Little in the Dayton, Ohio area driving a newer black Dodge truck. CS indicated that, at that time, Little was renting or living in the Huber Heights, Ohio area. DEA began performing surveillance in that area and observed Little driving a black Dodge truck with Ohio registration plate JJL-3325. Based on a query of the Ohio Bureau of Motor Vehicles (BMV), the truck was registered to Shatonne Jackson. DEA performed spot checks and regularly observed the truck parked at a residence in Huber Heights, Ohio during June and July 2021. Throughout that time, DEA saw Little using the truck several times. Given the CS's information and the presence of the truck at the Huber Height's residence, DEA

15

believed that Little was residing at the location. Before law enforcement could obtain a warrant for the location, Little appeared to vacate the premises as a spot check revealed a "For Sale" sign at the property.

24.  During January 2022, DEA again received information from the CS. The CS advised that Little had relocated to Clayton, Ohio and was now hiding from law enforcement in that area. The CS indicated that Little was still with Shinn. DEA subpoenaed Dayton Power and Light concerning any utilities in the name of Shinn and learned that she was paying for utilities at the Target Residence, i.e., 415 Bluebell Court, Clayton, Ohio 45315.

25.  On or about January 27, 2022, DEA was contacted by members of the ATF and Montgomery County, Ohio Sheriff's Office who indicated that Jai Barker and Tillman Washington had been involved in a shooting in Germantown Pike, Dayton, Ohio. Law enforcement officer's indicated Barker had driven Washington to the hospital where Washington was received with apparent gunshot wounds to his leg and groin. Sheriff's Deputies had responded to the shooting scene where numerous 9mm and .40 caliber shell casings were located around the parking lot. Through my familiarity with investigations in the Dayton RO, I know that

16

Barker and Washington are associated with the 41 Boyz, a large-scale drug trafficking organization that operates in Dayton, Ohio. I also know that the 41 Boyz are a rival drug organization to Little.

26. Around the time of the shooting, law enforcement received information from two independent sources identified herein as CS-2 and CS-3. Both CS-2 and CS-3 were providing information to law enforcement in exchange for judicial consideration on pending charges. Both CS-2 and CS-3 have proven reliable, and law enforcement has been able to corroborate independently information that they have provided. On independent occasions, CS-2 and CS-3 advised that, in or around January 2021, a drug trafficker in the Dayton, Ohio area named Adrian Little had placed cash bounties in the thousands of dollars on members of the 41 Boyz. Specifically, Little offered to pay these funds to any individual who killed a member of the 41 Boyz. Based on the information from the cooperating sources and the timing of the shootings directed at Barker and Washington, I believe that the incident was related to Little's offer of cash bounties on the 41 Boyz.

27. Based on my training and experience, I know that drug traffickers such as Little frequently use acts of violence to

intimidate and threaten rival drug operations.  I know that, in arranging the acts of violence, drug traffickers frequently use their cellular telephones and applications such as FaceTime, WhatsApp, Instagram, Facebook Messengers, iMessage or texts, to communicate the bounty and to coordinate with individuals who are willing to assist in the intimidation.  As noted above, Little has used his cellular telephone in the past to arrange drug transactions via messages on his cellule telephone.

28.  On or about January 31, 2022, I conducted a spot check at the Target Residence and discovered parked in the driveway a black Dodge truck with Ohio registration plate JDJ-109. Although bearing a different license plate, the truck appeared to be identical to that which law enforcement had observed Little driving during June 2021.  I observed a black male matching the description of Little exit the Target Residence via the garage, enter the Dodge truck and depart.  Notably, the man had the same build and hair style as Little.  I queried the BMV and learned that the Dodge truck with Ohio registration plate JDJ-109 had the same VIN number as the black Dodge truck in which Little had been observed during summer 2021.  The truck was now registered to Dominic Johnson.

29.  On or about January 31, 2022, DEA showed the CS a

18

picture of the Black Dodge truck parked in the driveway of the Target Residence. The CS advised that this was the truck that Little currently used. The CS further indicated that Little was placing assets in the names of relatives, including a cousin Dominic Johnson, to hide his property from seizure and to avoid detection of law enforcement. The CS advised that, as of late January 2022, Little was still trafficking drugs in the Dayton area.

30. On or about February 1, 2022, DEA conducted another spot check at the Target Residence. Law enforcement saw Little leave the Target Residence and enter the Dodge truck during the morning hours of that day. Little appears to live and spend the night at the Target Residence.

31. On February 7, 2022, I along with other law enforcement met with an individual identified herein as CD2. CD2 provided information to law enforcement in exchange for leniency on his federal sentence. Law enforcement had discovered CD2 in possession of a fentanyl mixture during late 2021. CD2 revealed that, as recently as late 2021, CD2 would have drug addicts test drugs – either fentanyl or heroin -- that CD2 received from a third party. CD2 observed the third-party FaceTime the third-party's source of supply – namely, "Fat

Mack".  CD2 knew Fat Mack to be Adrian Little.  During the
FaceTime, Little would discuss the quality of the drugs and
whether the third-party wanted to acquire additional amounts of
it.  Based on the conversations, CD2 concluded that Little was a
source of drug supply.  CD2 described Little as a "boss" in
Dayton – namely, someone who was a high-level drug trafficker
with a Mexican source of supply.  CD2 confirmed that Little was
currently selling narcotics in the Dayton, Ohio area.  Law
enforcement has been able to corroborate the information that
CD2 provided.  CD2 identified a photograph of Little as the
person CD2 knew as the of source of supply.

32.  Based on the foregoing as well as my knowledge of drug
trafficking modus operandi described below, I believe that
Little has engaged in an ongoing pattern of drug trafficking
activity that dates to 2020.  Little's involvement in one
completed and one contemplated drop of drug trafficking proceeds
is strongly indicative of his ongoing drug trafficking activity.
Indeed, he possessed a large sum of United States currency
during spring 2002 and again during federal warrants in the fall
of 2020.  Multiple sources – all of whom corroborate each other
– implicate Little in current, ongoing drug trafficking
activity.  As recently as January 2022, Little has been

implicated in attempts to kill rival drug dealers.  Evidence of these activities and contraband likely will be found at the Target Residence.  Little appears to live at this location.  As a current fugitive from the APA, Little likely will carry and keep his contraband with him at a safe location such as the Target Residence.  (Notably, as a condition of his supervision with APA, Little and his property are subject to warrantless searches).  Given his status as a fugitive, Little likely has hidden contraband, including drugs, currency, and firearms, at this location.  Additionally, Little appears to be in a dispute with a rival drug gang.  While drug dealers commonly carry firearms with them or maintain these weapons at their residence, it is even more likely that such contraband will be located in this instance given Little's ongoing feud with the 41 Boyz. Moreover, in this modern area, individuals typically carry their cellular telephones with them and keep such items at their homes – such as the Target Residence.  I know that drug traffickers use their cellular telephones to, among other things, arrange drug transactions, communicate with confederates and coordinate money drops.

33.  Moreover, based on my training and experience, I know that drug traffickers frequently engage in the following common

practices and activities:

      a.   It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers and cellular services by using other person's names in order to avoid detection by law enforcement officials.

      b.   It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use that service.

      c.   That drug traffickers often place assets in corporate entities in order to avoid detection of those assets by law enforcement officials.

      d.   It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

      e.   It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business and keep this contraband at their personal residences or at stash houses.

f. It is common practice that, at their residences or stash houses, drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them, such as their residences or at stash houses.

g. It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

h. That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

i. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these

23

profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts. Drug traffickers frequently keep such records at their residences or at stash houses.

j. Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles. Drug traffickers frequently keep records relating to such travel at their residences or at stash houses.

k. It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the

24

contacts list. Drug traffickers frequently keep such materials at their residences or at stash houses.

l.    Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property and their product, and that the photographs are usually maintained at the residences, businesses, stash houses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones and other electronic media, such as computers and tablets.

m.    Drug traffickers commonly have in their possession, (that is on their person, at their residence, stash houses, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

n.    Drug traffickers frequently maintain hidden compartments within their residence, stash houses and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

25

o.    The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone.  These details are usually agreed upon during face-to-face transactions.  For this reason, most telephone conversations regarding drugs are very brief and often in code, understood by the traffickers and designed to mislead or confuse non-participants of the conversations.  Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another.  When calling a beeper or text messaging, traffickers commonly input the number that should be called and sometimes add additional instructions in the form of additional digits. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers.  The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors.  The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest

26

associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

      p.   Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

      q.   I have repeatedly encountered a practice wherein drug traffickers distribute a cellular telephone number to their drug customers, often described by traffickers as a "money phone." The money phone is used primarily to communicate with those customers. The customers will subsequently call the trafficker on that cellular telephone number to arrange a purchase of drugs as needed. The trafficker will many times field calls from several customers at once, and then direct all those customers to travel in their car to a designated meeting point. Once all the customers have driven to the designated place, the drug trafficker will appear in his vehicle, quickly conduct hand to hand drug transactions with each customer, and then drive away. Drug traffickers often maintain money phones at their homes, stash houses, businesses or on their person.

Based on the foregoing, I respectfully submit that there is probable cause to issue the above-requested complaint and search warrant.

*Steven Lucas*

_____
Steven Lucas
Special Agent
Drug Enforcement Administration


Sworn and subscribed before me on the __7th___ day of ___February_____ 2022.


_____
Peter B. Silvain, Jr.
United States Magistrate Judge

28

ATTACHMENT A

**415 Bluebell Court, Clayton, Ohio 45315, including any outbuildings, garages, sheds or curtilage at this location.** The residence is depicted below:



ATTACHMENT B

I submit that there is probable cause to search for the following items:

A.  Log books, records, payment receipts, notes, and/or customer lists, ledgers, and other papers or electronic records relating to the transportation, ordering, purchasing, processing, and distribution of controlled substances.

B.  Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and/or records, and other items relating to domestic and foreign travel to obtain and distribute narcotics and narcotics proceeds, including, but not limited to airline receipts, vehicle rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, truck logs, travel agency vouchers, notes, records of long distance telephone calls, e-mail and other correspondence.

C.  Address and/or telephone books and papers reflecting names, e-mail and physical addresses and/or telephone numbers of individuals, partnerships, or corporations involved in drug trafficking and money laundering.

D.   Financial records, financial statements, receipts, statements of accounts and related bank records, money, drafts, letters of credit, money orders and cashier's checks receipts, passbooks, bank checks, escrow documents, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transferring, concealment, and/or expenditure of money.

E.   Electronic equipment such as pagers, computers, electronic organizers, facsimile machines, cellular telephones, caller ID, telephone answering machines, police scanners and two-way radios.

F.   United States currency, precious metals, coins bullion, jewelry, and financial instruments, including, but not limited to stocks and bonds.

G.   Proceeds of drug trafficking activity or any items used to facilitate drug trafficking activity, including automobiles.

H.   Photographs and/or photographic albums or video tapes and recordings of houses and other real estate, automobiles, and of other assets, persons, and/or controlled substances.

I. Indicia of occupancy, residency, and/or ownership of the premises, and vehicles including, but not limited to utility and telephone bills, canceled envelopes, keys, deeds, tax bills, titles, vehicle registrations and documentation regarding storage units/lockers.

J. Illegal drugs, including, but not limited to fentanyl, heroin and other controlled substances, and other tools used in the drug trade, including, but not limited to, scales, vacuum sealers, packaging material, presses, razor blades and cutting agents.

K. Firearms and ammunition.

L. Any computers, cellular telephones, tablets or electronic devices that may contain the above-described documents or items in electronic format.

M. Text messages, instant messages and the like that concern or relate to drug trafficking activity, including, but not limited to, sale prices, drug quantities, customers, sources of supply, or storage locations.